Sydney F. Foster, J.
This is a motion by. claimant New York State Thruway Authority to confirm the report of Beferees appointed to hear and report on the claim of the Authority for an offset or credit, against whatever balance may be due the State on moneys advanced, for expenditures charged to the Authority for improvements and additions to the State highway, parkway and canal systems and other State facilities made by, or at the direction or request of, any department or agency of the State for the sole benefit of the State and not required for Thruway purposes. The State has cross-moved to have the report of the Beferees rejected and the claim dismissed.
The claim was presented under an enabling act, chapter 669 of the Laws of 1964, which became effective April 22, 1964, and which is herewith set forth in full:
“ Section 1. Jurisdiction is hereby conferred upon the court of claims to hear and determine claims of the New York state thruway authority against the state for expenditures charged to the authority for improvements and additions to the state highway, parkway and canal systems and other state facilities made by, or at the direction or request of, any department or agency of the state for the sole benefit of the state and not required for thruway purposes and for lands acquired or used therefor. This section shall not be construed to alter, modify or repeal section three hundred forty-six of the highway law or section three hundred fifty-nine of the public authorities law.
“ | 2. Such jurisdiction shall be exercised in accordance with the provisions of the court of claims act except the provisions in respect of the time of filing claims, but no award shall be made or judgment rendered hereunder against the state unless such claims accrued on or before February twenty-eight, nineteen hundred and sixty-four, and are filed with the court of claims within six months from the effective date of this act.
“ § 3. Jurisdiction is hereby conferred upon the court of claims to make awards and render judgments on'such claims if the court shall find that such claims or any of them were founded in right and justice or in law or equity against the state and are in right and justice or in law or equity presently payable.by the state, and:
“ a. "Where the claims are for expenditures for lands solely for the state highway, parkway, or canal systems or other state facilities, such lands were acquired or used for such purposes, by or at the direction or request of a department or agency of the state, were not required for thruway purposes, and thé expenditures therefor were charged to the authority; or
*959 “ b. Where the claims are for expenditures for improvements or additions solely to the state highway, parkway or canal systems or other state facilities, such improvements or additions were made for such purposes, by or at the direction or request of a department or agency of the state, were not required for thruway purposes, and the expenditures therefor were charged to the authority.
“ § 4. Upon such findings the state shall be deemed liable for such claims and they shall constitute legal and valid claims against the state and the court of claims shall make such awards and render such judgments therefor as shall be just and equitable.
“ § 5. Any award resulting from such claims must be without interest and shall be applied as a credit upon, and may not exceed, the amount of the balance due under the advances made by the state for thruway purposes.
“ § 6. This act shall take effect immediately.”
The claim filed by the Authority under the foregoing act involved 133 sites along the line of the Thruway across the State, including grade crossings, the reconstruction of new highways, spurs and arterial connections, and in some instances intersections, where it was alleged that the Authority had made expenditures for the benefit of the State and not for Thruway purposes. It became apparent that if the principles of liability asserted by the Authority against the State were accepted, a trial of the claim would be somewhat in the nature of a protracted accounting and involve many engineering problems. Because of this, the court, with the consent of the parties, appointed two eminent engineers and a distinguished former jurist to act as Referees, take testimony and report to the court (see CPLR 4001; 4212; 4311; 4312, subd. 1; Court of Claims Act, § 9, subd. 9). Some 78 days of trial ensued, and a vast number of exhibits were introduced into evidence. At the conclusion thereof and after considerable study the Referees passed upon 738 findings proposed by the parties, and did so with painstaking care, so their report clearly reveals. It may also be added that the Referees viewed many of the sites in controversy. There is an excellent and comprehensive foreword to their report, describing their method of operation and generally as to the conclusions at which they arrived. They found the Authority was entitled to a credit of $30,842,519, or such part thereof that does not exceed the amount due to the State for moneys advanced.
The court accepts the factual findings of the Referees and does not propose to discuss in detail the evidence relied upon to *960 support them. Such a course is prohibitive under the fair limitations of a, memorandum, and would be akin to the aphorism that too many trees obscure a vision of the forest. Suffice it to say that such factual findings, apart from any issues of law, are well supported by competent and convincing engineering testimony. There are in the opinion of the court two, or perhaps three, major and decisive issues of law. To focus attention upon them some historical statutory background seems appropriate.
In 1942 a Thruway across the State first received legislative attention (L. 1942, ch. 914), and this act became article XII-A (§ 346 et seq.) of the Highway Law. The Superintendent of Public Works was authorized to design and construct a Thruway from Suffern at the Now Jersey line, north to Albany and then across the State to Buffalo and down to the Pennsylvania line. No moneys were immediately appropriated, however, and apparently the legislation was enacted so the Department of Public Works could begin its studies and then proceed with construction after the war. In 1943 the Niagara Section extending from the main line of the Thruway through downtown Buffalo, and from there along the Niagara River to Niagara Falls, was added to the system (L. 1943, ch. 701); and in 1944 the Berkshire and New England Sections were added (L. 1944, chs. 360, 785).
The foregoing sections of the Highway Law, as amended, contemplated that the Thruway should be a part of the State highway system, and paid for only from moneys specifically appropriated for such purpose (Highway Law, § 348). Section 346 of said Highway Law directed that intersecting highways and railroads must not cross at grade but on structures determined adequate therefor by the Superintendent of Public Works, the entire cost of such structures to be included in the cost of the Thruway. Under this setup and by 1950, when the Thruway Authority was created, only about 8 miles of the Thruway had been completed and another 29 miles was under construction. There is respectable testimony in the record to the effect that if this method had been followed without change, especially since construction depended upon annual appropriations by the Legislature, the Thruway could not have been completed for many years.
During the Second World War highway construction in the State had lagged to a very considerable degree, and after the war traffic congestion on existing highways increased from day to day. That the State was in dire need of a Thruway was a fact beyond dispute. The possibility of constructing and operating the Thruway as a toll road, built with private capital, and thus *961 a self-liquidating project, had been explored and found not feasible because there seemed to be no way available to connect the Thruway directly with New York City due to bridge difficulties. These difficulties were ultimately solved by the proposed use of a newly perfected principle of bridge design, now in use at Tappan Zee, to span the Hudson River and connect the Thruway system with New York City traffic.
Interest was then revived in the principle of a self-liquidating Thruway and the act creating the Thruway Authority was passed by the Legislature and signed by the Governor on March 21, 1950 (L. 1950, ch. 143; Public Authorities Law [New York State Thruway Authority Act], § 350 et seq.; see, also, L. 1951, ch. 776). The Authority was declared to be a body corporate and politic constituting a public corporation, the board of which was to consist of three members appointed by the Governor with the advice and consent of the Senate. Any officer or employee of the State was eligible for appointment to the board but was not to receive double compensation. As a matter of fact Dr. Bertram D. Tallamy, the Superintendent of Public Works, was appointed Chairman of the Authority, and R. Burdell Bixby, from the Governor’s executive staff, was appointed a member and became Secretary of the Authority. The course of the Thruway across the State was set forth in detail, and the Authority was empowered to provide for its construction on a self-liquidating basis; and to finance these operations the Authority was authorized to issue bonds and notes in an aggregate amount not to exceed $500,000,000. The State was to guarantee the payment of these bonds, but two years were required for a constitutional amendment to effectuate that purpose (see N. Y. Const., art. X, § 6).
In the meantime the Legislature appropriated the sum of $80,000,000 from the Capital Construction Fund as an advance for Thruway construction (L. 1951, ch. 44, § 6; L. 1951, ch. 210, § 12). These moneys were not advanced directly as a loan to the Authority but appropriated to the Department of Public Works. The Superintendent of Public Works was authorized to enter into a formal agreement or agreements with the Authority for the continuation of Thruway construction, and no part of the appropriation was to be available for expenditure until such agreement or agreements were made. Any expenditures from the appropriation were to be repaid to the State in the manner provided by subdivision 2 of section 357 of the Public Authorities Law.
Under the act creating the Authority all engineering work had to be performed by the Department of Public Works. Although *962 the act provided: “ Highway and railroad grade crossings shall in general be separated by structures to be determined by the authority, and the authority is hereby authorized to combine or relocate intersecting highways, to adjust traffic to such grade separation structures ” (Public Authorities Law, § 359, subd. 3), this provision became somewhat of a dead letter in actual practice. According to the testimony of Dr. Tallamy, who occupied the dual position of Superintendent of Public Works and Chairman of the Authority from 1950 to 1955, the Department of Public Works had complete control of the design and of the construction of the Thruway facilities and approaches. It was not until 1954 that the Authority in this respect could become independent of the Department of Public Works (L. 1954, ch. 517), and by that time the major part of construction on the main line had been completed. Thus from 1950 to 1954 the Authority was autonomous in theory but not in fact, and even after 1954 the work of finally completing the Thruway remained under the supervision of the Department of Public Works.
Construction work on the Thruway between 1950 and 1954 was carried on with great rapidity under the supervision of Dr. Tallamy and his deputy engineers in the Department of Public Works. An authorization for an additional issue of bonds was given (L. 1954, ch. 516), and an issue of approximately $500,000,000 was eventually sold. This second issue was not guaranteed by the State but the bonds were made a prior lien on the net revenues of the Authority. All those concerned testified that speed of construction was a prime desideratum so that the Thruway could be speedily opened as a toll road.
When it came to the design and construction for the separation of grade crossings, and other facilities having to do with intersections, the connection of arterial highways, parkways, and the canal system, the Department of Public Works adopted criteria designed to meet the convenience and anticipated needs of future traffic on the State highways, or for the benefit of the State in other respects. Dr. Tallamy, and J. Burch McMorran, then Chief Engineer of the Department of Public Works and also of the Thruway Authority, both testified that it became a definite policy as early as 1952, or perhaps earlier, that the Thruway should only assume costs for construction that inured solely for the benefit of the Thruway, and not for the construction costs for work that inured to benefit of the State highway system, or other State facilities. This policy was deemed to apply not only to designs and construction drawn and performed after 1950, but also to that portion of the Thruway built prior thereto as a part of the State highway system, and for which *963 the Authority paid under protest and in round figures the sum of $26,000,000.
No attempt was made at the time of construction to separate and allocate costs solely for the benefit of the Thruway and those which benefited the State highway system, because to have done so, according to the testimony of Dr. Tallamy, would have greatly delayed the completion of the Thruway; but according to the testimony of those in charge of construction there was included in the policy mentioned an understanding that there would be an accounting when construction of the Thruway system was completed. Dr. Tallamy was very definite in his testimony that all designs made under his supervision were made from the viewpoint of the Department of Public Works. No determinations of any kind were made in behalf of the Authority.
In support of the foregoing there is considerable correspondence in the record between Dr. Tallamy, Conrad H. Lang, now Chief Engineer for the Authority, Mr. McMorran, and Dr. T. Norman Hurd, the Director of the Budget.
In February, 1963, moreover, which was of course at a time following the completion of the Thruway system, one of the series of agreements entered into between the Authority and the Director of the Budget, to provide in accordance with subdivision 2 of section 357 of the Public Authorities Law for the time and manner of repayment of the moneys advanced by the State, recognized the underlying basis' of an accounting for expenditures charged to the Authority for betterments to State facilities. This agreement provided in part:
1 ‘ whereas, representatives of the division or the budget and the state department op public works and the authority have, since July of 1960, conducted joint field inspections of approximately 125 construction sites along the route of the Thruway and have jointly agreed that sums in substantial amounts have been expended for land and for improvements and additions to the State highway and parkway system and other State facilities, for purposes not essential to Thruway operation, and
“ WHEREAS, the BUDGET DIRECTOR, the SUPERINTENDENT OP PUBLIC works and the authority have been unable during the period of this Agreement, as last extended to March 1, 1963, to reach agreement with respect to the precise amount expended for State purposes and are continuing their discussions and negotiations with respect thereto
Negotiations were continued and there was further correspondence between officials representing the Department of Public Works, the Authority, and the Director of the Budget, but no settlement was achieved. In addition studies of the problem *964 were made by experts, some jointly by the Director of the Budget, the Department of Public Works and the Authority, and one for the State Comptroller. Apparently no consensus was reached in further agreements as to the precise amounts involved, and the Comptroller indicated that any reduction of the Authority’s remaining debt to the State by way of credits would require action by the Legislature or a court of competent jurisdiction. Thereafter in 1964 the enabling act, set forth in full at the beginning of this memorandum, was passed by the Legislature.
All this leads to the first major issue of law as the court envisages the record and the issues involved. The State objected very strenuously to any evidence of an understanding, agreement or policy on the part of the officials mentioned, on the ground they lacked authority to bind the State by any such arrangement. With regard to grade crossing structures particularly, and generally with regard to other facilities, the State takes the position that the Department of Public Works was bound to adopt in its design and construction of grade crossings and other facilities the criteria devised by the department itself for general highway design and construction. It follows of course that if this position is correct the Authority is bound by the cost of all improvements irrespective of whether they included State highway benefits of no benefit to the Thruway system.
We think that this would be a good argument, indeed that it might be conclusive, if the claim was brought upon an understanding or agreement. But as we view it, and as the Referees found, such was not the case. The evidence concerning an understanding between the officials concerned was introduced in aid of construing the intent and purpose of the enabling act, and to establish the fact that the Legislature recognized a moral obligation on the part of the State. It is quite incredible to believe that the Legislature was not cognizant of the controversy between the Authority and the State as to the principal components of the claim. When it passed the enabling act it is more than a fair inference that it placed its imprimatur on the understanding of a final accounting as constituting a moral obligation on the part of the State. That it had power to do so is so well settled as to be beyond dispute (Williamsburgh Sav. Bank v. State of New York, 243 N. Y. 231). There remained only the quantum and integrity of the proof to bring the claim within the ambit of the enabling act as a matter of right, justice and equity.
*965 The second major issue of law is what effect is to be given to this language of the enabling act: “ This section shall not be construed to alter, modify or repeal section three hundred forty-six of the highway law or section three hundred fifty-nine of the public authorities law.”
Section 346 of the Highway Law, under which the Department of Public Works designed and constructed a small segment of the Thruway as a part of the. State highway system prior to 1950, provided: 11 Highway and railroad grade crossings shall be eliminated generally by structures to be determined by the Superintendent of public works * * *. The entire cost of such structure as so determined by the superintendent of public works shall be included in the cost of the thruway.”
Subdivision 3 of section 359 of the Public Authorities Law, provided originally and still provides: “ Highway and railroad grade crossings shall in general be separated by structures to be determined by the authority * * ®. The cost of all such structures, except such part as is otherwise payable, shall be borne by the authority.”
Reading these provisions together they do not, in the opinion of the court, appear to be fatal to the claim under the enabling act so far as grade crossing structures are concerned. Both sections placed the duty of eliminating railroad and highway grade crossings on the Thruway builders because it was essential to the operation of Thruway that there be no crossings at grade. The Legislature provided that existing highways and railroads be carried across the Thruway on structures determined at first by the Superintendent of Public Works, and later by the Authority, as a Thruway cost. We think the limiting language in the enabling act was placed there as a precautionary measure, in view of the broad language of the act, to prevent any controversy over the Authority’s liability for the legitimate costs of grade crossing structures as limited by Thruway purposes. As thus construed the limiting language is not inconsistent with the apparent intent and purpose of the enabling act, which was to permit the Authority to recoup for expenditures charged against it for improvements and additions ‘ ‘ to the state highway, parkway and canal systems and other state facilities” for the sole benefit of the State and not required for Thruway purposes. It would be anomalous to say the least to construe the limiting language in the light of reason, justice and equity as barring a claim for excess grade crossing structures and highway structures above and beyond Thruway purposes.
*966 A third and somewhat subsidiary issue of law relates to the proof offered by the Authority as to costs it claims to recover. As heretofore indicated the Authority contended that it was only obligated to erect structures sufficiently wide enough to carry the original intersecting highways, and where such structures were made to a greater width in anticipation of future traffic needs, the additions were for the sole benefit of the State highway system. Such was also the conclusion of the State engineers who built the Thruway. As proof of credits the Authority sought for these matters it produced percentage formulae through the medium of engineering testimony. This type of testimony was also used to support the claim of the Authority for the replacement of highways in order to conform with grade separations. The Authority claimed credit on a percentage basis for replacing old highways with new construction of a greater width and an increased probable service life in many instances. This form of proof has been strongly challenged by the State, but it was vouched for by engineers of competence, and it is difficult to see how other or better proof could have been found at a time when construction had long since ceased. The ultimate issues of whether any parts of such additions and replacements were betterments solely for the benefit of the State highway system, and not essential for Thruway purposes, and the extent thereof, were issues of fact. If the theory of liability adopted by the Referees and the court is a valid one, such issues could scarcely be determined as a matter of law.
The court has covered briefly what it considers to be the major issues of law in the case. It must be recognized that the case is unique and extraordinary, for which no ready-made precedent can be found. So far as grade crossing structures are concerned we do not regard the so-called railroad cases, cited by the State, as being apposite or decisive on the issues involved here. The factual situations differ in important respects, and above all no enabling acts were involved in the railroad cases. More nearly analogous, although not controlling, is an opinion of the Attorney-General dealing with relocation of public utility facilities (1951 Atty. Gen. 139).
A large part of this memorandum deals with grade crossing structures, and indeed a major part of the claim deals with such matters. But there were substantial claims with respect to other items, among them: Barge Canal improvements; the Schenectady Spur so-called; Palisades Interstate Parkway structures; the Utica Arterial Connection; Oak and Elm Streets, Niagara Interchange; the New Rochelle Arterial Connection; *967 the Bye Arterial Connection; Taeonic State Parkway structures ; and additional highway construction in connection with interchanges, in which grade crossings were not entirely involved. The record and findings indicate that from a substantial viewpoint claims with respect to these items involved primarily issues of fact. The Beferees’ findings and allowances as to these matters are supported by solid engineering testimony, some of which came from the State’s own engineers.
The record presents a fair preponderance of evidence to support the findings of the Beferees that the claim of the Authority was founded in right, justice and equity. The court adopts the report of the Beferees and the findings therein, and makes the same its own. The court also finds from the proof that a moral obligation existed on the part of the State under the enabling act. Claimant therefore is entitled to a judgment for the sum found by the Beferees, less a deduction of $92 consented to by claimant, in the total amount of $30,842,427, without interest, which shall be applied as a credit upon, and may not exceed, the amount of the balance due under the advances made by the State for Thruway purposes. The Beferees found the amount due to the State for advances made was $24,668,713.54, but whether interest is due upon this amount, and if so the extent thereof, was a matter not litigated, and hence the court can only direct judgment within the limitation expressed.
Motion by claimant for confirmation of the Beferees’ report, as herein modified, granted; cross motion of the State to reject the report and dismiss the claim denied.